**UNITED STATES of America, Plaintiff,**

v.

**Kevin Sidney HAZZARD, Byron Randolph and Kevin Stephens, Defendants.**

**No. 84 CR 771.**

United States District Court, N.D. Illinois, E.D.

Dec. 11, 1984.

Robert L. Graham, Jenner & Block, Chicago, Ill., for Hazzard.

Ronald G. Draper and Nathaniel R. Howse, Chicago, Ill., for defendants.

Joseph Hartzler, Lawrence Rosenthal, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Defendant Kevin Sidney Hazzard has moved to revoke or amend an order entered by a United States magistrate on October 23, 1984 ordering his pretrial preventive detention pursuant to the Bail Reform Act of 1984 ("the Act"), 18 U.S.C. § 3141, *et seq.* Section 3145(b) of the Act provides that if a person is ordered detained by a magistrate he may file with the court having original jurisdiction of the offense a motion for revocation or amendment of the

order. The Act requires that the motion shall be determined promptly.[1]

Hazzard contends that the detention order should be reversed and reasonable bail set for one or more of the following reasons:

(a) The detention order was entered pursuant to the provisions of a statute which, both on its face and as applied to Hazzard, deprives him of constitutional rights to bail, to the presumption of innocence, to due process of law, and to equal protection of the laws.

(b) The detention order was entered without providing Hazzard with the discovery necessary to a meaningful exercise of his right to cross-examine, to confront witnesses, and to present evidence.

(c) The hearing was inadequate because of the government's reliance on hearsay evidence and because of the limits placed on cross-examination.

(d) To apply the Act in this case would violate the Ex Post Facto clause of the Constitution because the offense charged allegedly occurred on October 6, 1984 and the Act did not become law as part of the Comprehensive Crime Control Act of 1984 until October 12, 1984.

## I. Applicable Statutory Provisions

On October 12, 1984 the Bail Reform Act became law as Chapter II of the Comprehensive Crime Control Act of 1984. Because of new interrelated provisions pertaining to detention hearings, it is appropriate to set forth at the outset the parts of the Act which govern this proceeding:

"§ 3141. *Release and detention authority generally*

"(a) PENDING TRIAL.—A judicial officer who is authorized to order the arrest of a person pursuant to section 3041 of this title shall order that an arrested person who is brought before him be released or detained, pending judicial proceedings, pursuant to the provisions of this chapter.

\* \* \* \* \* \*

"§ 3142. *Release or detention of a defendant pending trial*

"(a) IN GENERAL.—Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be—

\* \* \* \* \* \*

(4) detained pursuant to the provisions of subsection (e).

\* \* \* \* \* \*

"(e) DETENTION.—If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial.... Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed ... an offense under section 924(c) of title 18 of the United States Code [possession of a firearm during the commission of a felony].

"(f) DETENTION HEARING.—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community in a case—

(1) upon motion of the attorney for the Government, that involves—

---

**1.** Defendant's supporting brief was filed on November 7, 1984. The government's answer brief was filed on November 19. Defendant's reply brief was filed on November 21. The reply brief raised an issue concerning the application of the Ex Post Facto clause of the Constitution. The government, therefore, was allowed until November 30 to file a response to this issue.

(A) a crime of violence;

\* \* \* \* \* \*

"The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government seeks a continuance. Except for good cause, a continuance on motion of the person may not exceed five days, and a continuance on motion of the attorney for the Government may not exceed three days.... At the hearing, the person has the right to be represented by counsel, and, if he is financially unable to obtain adequate representation, to have counsel appointed for him. The person shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. The person may be detained pending completion of the hearing.

"(g) FACTORS TO BE CONSIDERED. —The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past

conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

\* \* \* \* \* \*

"(i) CONTENTS OF DETENTION ORDER.—In a detention order issued pursuant to the provisions of subsection (e), the judicial officer shall—

(1) include written findings of fact and a written statement of the reasons for the detention;

(2) direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(3) direct that the person be afforded reasonable opportunity for private consultation with his counsel; and

(4) direct that, on order of a court of the United States or on request of any attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding.

"The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

"(j) PRESUMPTION OF INNOCENCE. —Nothing in this section shall be construed

as modifying or limiting the presumption of innocence.

"§ 3145. *Review and appeal of a release or detention order*

\* \* \* \* \* \*

"(b) REVIEW OF A DETENTION OR-DER.—If a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly."

## II. The Charges, the Evidence Presented and the Magistrate's Order

On October 15, 1984, defendant Hazzard and co-defendants Byron Randolph and Kevin Stephens were charged in a complaint filed with a magistrate with a violation of 18 U.S.C. § 1201(a)(1): namely, abduction and kidnapping from Calumet, Illinois to Gary, Indiana for the purpose of sexual activity. A hearing was held on October 23, 1984.[2]

The evidence before the magistrate which relates to Hazzard was presented by the affidavit and oral testimony of Agent Harris of the Federal Bureau of Investigation who investigated a case of abduction of five young women in the vicinity of Gino's Liquor Store in Calumet City, Illinois on October 6, 1984. According to a statement made to him by one of the victims, two persons (later identified as defendants Hazzard and Randolph) armed with a pistol and a sawed-off shotgun entered a van in which the victims were present, robbed them at gunpoint and took control of the van. One of the perpetrators drove the van to Hammond, Indiana. Upon reaching Hammond, the van was stopped at a railroad crossing and two of the victims, taking advantage of the opportunity created by the crossing stop, were able to escape.

The van was driven to Gary where it was parked. The defendant Stephens, having followed the van in an automobile, entered the van and the victims were ordered to perform sexual acts at gunpoint and then they were raped by all three defendants. One victim was beaten. The agent testified to seeing abrasions on one of the victims he interviewed.

On October 15, 1984, one of the victims identified Hazzard from a photographic spread as one of the perpetrators. On the same date defendant Randolph was also identified as a perpetrator by a victim. Also on that date the Federal Bureau of Investigation determined that one of the fingerprints that had been found in the van immediately after the assault was the fingerprint of Hazzard. Warrants were issued for the arrest of all defendants on October 15, 1984, and were executed on October 16, 1984.

After the defendants were taken into custody on October 16, 1984, all three made written statements. Agent Harris, who testified before the magistrate, took the statement of Hazzard. Harris testified that Hazzard was advised of his constitutional rights before his statement was taken.

Hazzard's statement received in evidence is as follows:

I, Kevin S. Hazzard, hereby make the following free and voluntary statement to Ivan G. Harris and Michael J. Konkol who have identified themselves as Special Agents of the FBI. I have been advised by S.A. Harris that I am being interviewed in connection with the kidnapping, robbery, and rape of several women from Calumet City, Illinois.

I was born on March 5, 1959, and I can read and write, having a high school education.

I helped kidnap, rob, and rape several women from Calumet City, Illinois on Oct. 6, 1984. I wore a dirty tan parka with hood, blue jeans, and carried a .22

---

**2.** A probable cause hearing was held on October 26, 1984. The Grand Jury returned an indict-

ment on November 15, 1984.

or .25 caliber silver pistol. I drove the victim's van from Calumet City to Gary, Indiana. I took $12.00 from one of the women. Upon arriving in Gary, Indiana, I parked the van and raped two of the women.

On the evening of Oct. 6, 1984 I met with Byron Randolph and Kevin Stephens. We then all went to Calumet City, Illinois in Stephens' car. Stephens was driving. Byron Randolph was carrying a sawed-off shotgun and Stephens gave me a .22 or .25 caliber silver pistol. Stephens dropped myself and Randolph off in the area of Gino's in Calumet City. Stephens was to park a short distance away and was to be the getaway driver. Randolph and myself were going to rob someone in the parking lot of Gino's. Byron and myself saw a white female getting into a van. At this time I rushed her and shoved her into the van. Byron followed me into the van with his sawed-off shotgun. I took $12.00 from one girl and Byron took $8.00 from the other girls. I then drove the van around the block where I got out and told Stephens we had four white girls and to go home. I then went back to the van where Byron was holding the girls at gunpoint. I drove the van to Hammond, Indiana where two of the girls escaped while we were waiting at a railroad crossing. After the two girls escaped I drove to Gary, Indiana with Byron and the remaining girls. When we left the railroad crossing I noticed Stephens was following me. When we got to Gary, Indiana I parked the van in the area of 8th and Ralston. Stephens parked his car approximately one block away. While I was raping one of the women Byron was raping one of the other women. Kevin Stephens joined Byron and myself at this time and raped one of the other women. I also had sex with the other women as did Byron and Stephens. Byron then went through the womens' purses. I then drove the van around the corner. Byron told the girls not to leave for ten minutes and we left. We went to Stephens car and went home.

I gave the pistol back to Stephens that night.

/s/ Kevin S. Hazzard

Hazzard, 24 years of age, is unemployed, resides with his mother in Indiana, and has a high school education. He has been arrested twice and spent 30 days in custody as a result of one of the arrests.

A line-up of 10 individuals, three of whom were the defendants charged in this case, was conducted by the Federal Bureau of Investigation. One of the attorneys representing one of the defendants was present at the line-up. Five unidentified persons viewed the defendants. Two persons identified them. Three persons did not. The magistrate sustained the government's objections to providing any information upon cross-examination concerning the line-up.

The magistrate entered a written order setting forth his findings of fact and statement of reasons. He determined that defendants were charged with a crime of violence; that there was probable cause to believe that the defendants had committed a weapons offense within the meaning of 18 U.S.C. § 924(c); and that the testimony and affidavit of Agent Harris supplied ample evidence, consisting of eyewitness testimony, fingerprints, and defendants' admissions that they kidnapped and transported a victim across state lines using at least two firearms. The Magistrate concluded that his findings gave rise to a rebuttable presumption that no combination of conditions of pretrial release would assure the safety of the community.

The magistrate concluded that the presumption had not been rebutted. He observed that defendants' personal histories did not support their release. All are unmarried. Hazzard and Stephens are unemployed. Randolph works for his father. Hazzard had been arrested on two occasions. Randolph has been previously convicted of burglary. Stephens had been arrested recently for carrying a concealed weapon. The Magistrate concluded that the government had demonstrated, by clear and convincing evidence, that no condition

or combination of conditions of pretrial release would reasonably assure the safety of the community and persons within the community.

Defendants were committed to the custody of the Attorney General under terms requiring their segregation from convicted persons if practicable; requiring that they be afforded reasonable opportunity for private consultation with counsel; and requiring that they be brought before the Court when ordered to do so or upon request of an attorney for the government.

### III. The Grounds Urged in Opposition to the Detention Order

#### A. Violation of the Eighth Amendment

■ Hazzard argues that the Eighth Amendment, which provides that "Excessive bail shall not be required," necessarily implies a right to bail. Therefore, he argues, the Act is unconstitutional because it authorizes detention without bail of persons awaiting trial. Hazzard principally relies on the following dicta from *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 1 (1951):

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 156 U.S. 277, 285 [15 S.Ct. 450, 453, 39 L.Ed. 424] (1895). Unless this right to bail before trial is preserved, the presumption of innocence, secured only

after centuries of struggle, would lose its meaning.

Since *Stack* involved only the statutory question whether the amount set as bail was proper, the statement is dicta, or at most shows the importance of setting reasonable bail for *bailable* offenses. Moreover, the Court's reliance on the Judiciary Act of 1789 and the Federal Rules of Criminal Procedure makes clear that the "traditional right" the Court speaks of is a statutory, not constitutional, right.[3]

More to the point is *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), in which the Court upheld the discretionary power of the Attorney General to hold aliens in custody without bail, pending determination as to their deportability, where there is reasonable cause to believe their release on bail would endanger the safety and welfare of the United States. Responding to the claim that the statute violated the Eighth Amendment, the Court stated:

> The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept. The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country.

*Id.* at 545, 72 S.Ct. at 536 (footnotes omitted).

---

3. The lower court cases relied on by Hazzard do not support his claim of a right to bail. *Hunt v. Roth*, 648 F.2d 1148 (8th Cir.1981), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (*per curiam*), expressly declined to hold an absolute right to bail exists and relied on the fact that no individualized finding of dangerousness was required by the statute in question. 648 F.2d at 1164–65. *Finetti v. Harris*, 609 F.2d 594 (2d Cir.1979), *United States ex rel. Goodman v. Kehl*, 456 F.2d 863 (2d Cir.1972), and *United States ex rel. Fink v. Heyd*, 287 F.Supp. 716 (E.D.La.1968), *aff'd*, 408 F.2d 7 (5th Cir.), *cert. denied*, 396 U.S. 895, 90 S.Ct. 192, 24 L.Ed.2d 172 (1969), all imply at most that bail cannot be denied irrationally or arbitrarily. No such claim is or could be made here. Finally, the statement by Justice Butler sitting on circuit in *United States v. Motlow*, 10 F.2d 657 (1926), does support Hazzard's position but, in this Court's opinion, is inconsistent with the Eighth Amendment's history and does not survive *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952).

Hazzard argues *Carlson* must be limited to its facts—civil deportation proceedings against aliens. However, the language quoted makes clear that the Court believed the determination of which offenses shall be bailable to be a duty of Congress rather than a duty of courts interpreting the Eighth Amendment. And even if dicta, this Court agrees with the conclusion that history refutes an absolute right to bail. See the discussion in *Hunt v. Roth*, 648 F.2d 1148 (8th Cir.1981), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (*per curiam*). Moreover, Hazzard concedes that bail has traditionally been denied in cases involving risk of flight. His Eighth Amendment argument therefore reduces to the claim that bail must be granted unless a sufficient reason exists for denying it, and that protecting the community from further crime is not a sufficient reason. If he means that reason could never be sufficient, he is wrong. *Schall v. Martin*, —— U.S. ——, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984). If he means that reason is not sufficient to outweigh Hazzard's countervailing interest in freedom, that is really a due process argument and is discussed below.

Hazzard also argues that the Act allows an easy end-run around the Eighth Amendment's ban on excessive bail by allowing bail to be denied altogether (which, it could be argued, is the same as setting bail too high). That argument ignores the strict limitations in the Act which prevent both denial of bail as a matter of course and setting excessive bail. It may be that some reasons for denying bail would violate the Eighth Amendment, *see Hunt v. Roth, supra* (state statute denying bail on sole ground that defendant is accused of a particular non-capital crime violates the Eighth Amendment), but *Schall* makes clear this is not such a case. Therefore, this Court is satisfied that the Eighth Amendment did not prevent Congress from enacting the pretrial detention provision in the Act.

As a subsidiary argument in support of his Eighth Amendment challenge to the new Act, Hazzard contends that pretrial detention undermines a "presumption of innocence" which is implicitly in the Eighth Amendment, and cites the dictum in *Stack, supra*, that unless bail before trial is preserved, the presumption of innocence "would lose its meaning." 324 U.S. at 4, 72 S.Ct. at 3. However, in considering the rights of pretrial detainees in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court made it clear that this legal doctrine applies only in a trial context and has no application to pretrial detainment.

The presumption of innocence is a doctrine that allocates the burden of proof in criminal trials; it also may serve as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indictment, or custody, or from other matters not introduced as proof at trial. *Taylor v. Kentucky*, 436 U.S. 478, 485 [98 S.Ct. 1930, 1934, 56 L.Ed.2d 468] (1978); see *Estelle v. Williams*, 425 U.S. 501 [96 S.Ct. 1691, 48 L.Ed.2d 126] (1976); *In re Winship*, 397 U.S. 358 [90 S.Ct. 1068, 28 L.Ed.2d 368] (1970); 9 J. Wigmore, Evidence § 2511 (3d ed. 1940). It is 'an inaccurate, shorthand description of the right of the accused to "remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion; ..." an "assumption" that is indulged in the absence of contrary evidence.' *Taylor v. Kentucky, supra*, [436 U.S.] at 484, n. 12 [98 S.Ct. at 1934, n. 12]. Without question, the presumption of innocence plays an important role in our criminal justice system.... *But it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun.*

*Id.* at 533, 99 S.Ct. at 1870. The Act provides that "[N]othing in this section [pertaining to pretrial detention] shall be construed as modifying the presumption of innocence." 18 U.S. § 3142(j). The presumption of innocence is a doctrine that

affects the trial process. It does not prohibit pretrial detention based on dangerousness.

## B. Detention Without Bail Violates the Due Process and Equal Protection Provisions of the Fifth Amendment

### 1. Due Process

Hazzard challenges the Act under the Due Process Clause of the Fifth Amendment on the grounds that the interest of the community can never outweigh an individual's liberty interest in avoiding the constraint of pretrial detention. Hazzard also contends that pretrial detention constitutes punishment without an adjudication of guilt.

■ In the recent case of *Schall v. Martin,* —— U.S. ——, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), the Supreme Court upheld a New York statute which permits pretrial detention of a juvenile if a judge determines that there is a "serious risk" that the juvenile, if on release, may "commit an act which if committed by an adult would constitute a crime." *Id.* at 2405 (quoting N.Y. Family Court Act § 320.-5(3)(b)). The Court stated that the appropriate due process clause analysis to be:

> First, does preventive detention under the New York statute serve a legitimate state objective? And, second, are the procedural safeguards contained in the Family Court Act adequate to authorize the pretrial detention of at least some juveniles charged with crimes?

*Id.* at 2409 (citations omitted). First, with respect to the question of whether preventive detention serves a legitimate government objective, the *Schall* court stated: "The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted." *Id.* at 2410 (quoting *DeVeau v. Braisted,* 363 U.S. 144, 155, 80 S.Ct. 1146, 1152, 4 L.Ed.2d 1109 (1960)). The Bail Reform Act is premised on this interest. Congress determined that

there was widespread crime being committed by persons on pretrial release which could be prevented through the detention of persons who pose an unacceptable risk of committing pretrial crime. The Act serves the same compelling interest as the New York statute. A compelling government interest can justify the most serious restrictions on a person's liberty. *See Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (commitment of the mentally ill who pose a danger to society); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (commitment of the retarded because they are unable to care for themselves). It follows that the compelling crime-prevention interest that *Schall* held justified the detention of persons likely to commit crimes is sufficient to legitimate pretrial detention.

■ It is true that *Schall* involved juvenile offenders, whom the Court found had a lesser interest in freedom from institutional restraints because minors "are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae.*" 104 S.Ct. at 2410. Based on that difference, Hazzard in effect argues that *Schall* must be read as holding that the government interest in preventing crime just barely overcomes a juvenile's interest in freedom. By implication, the same government interest is insufficient to overcome the greater challenge presented by an adult such as Hazzard, and therefore the Act is unconstitutional.[4] This Court does not agree. First, nothing in the *Schall* opinion indicates the Court believed the case was so close that a slightly stronger individual interest would have tipped the balance. More important, the government interest involved here is not merely legitimate, it is "compelling." 104 S.Ct. at 2410. As already noted, a compelling interest can justify restricting a person's liberty. Moreover, though the government interest here

---

**4.** The government argues *Schall* is indistinguishable because the Court there stressed that the importance of crime prevention is the same whether the offender is a juvenile or an adult.

This Court agrees that the government interest is as strong here as in *Schall.* That is not, however, responsive to Hazzard's claim that his interest in liberty is greater here than in *Schall.*

is the same as in *Schall,* this statute is more precisely drawn since it specifies the factors to be considered, thereby reducing the likelihood of error. Finally, the balance of interests is no different in this context than in the traditional detention of defendants thought to pose too great a flight risk. All the arguments made against this Act—that detention constitutes punishment, that the prediction on which it is based is impossible to make with any accuracy, that less drastic means are available to assure the government's objective—can be made against that traditionally accepted form of detention. And surely the government interest in preventing disruption of the judicial system by the non-appearance of a criminal defendant is not greater than the interest in preventing the harm caused by crime.

Hazzard's further argument that pretrial detention constitutes punishment of pretrial detainees is without merit. Again, *Schall* forms the analysis:

> Even given, therefore, that pretrial detention may serve legitimate regulatory purposes, it is still necessary to determine whether the terms and conditions of confinement under [the statute] are in fact compatible with those purposes. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate purpose." Absent a showing of an express intent to punish on the part of the State, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is as-

signable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

*Id.* at 2412–13 (citations omitted).

There has been no showing of any express legislative intent to punish persons detained under the Act. Indeed, the Act belies such a purpose by providing that detainees must be confined, to the extent practicable, separate from persons awaiting or serving sentences or being held pending appeal. 18 U.S.C. § 3142(i)(2). Also, the legislative history indicates not an intent to punish but rather an intent to protect the community against persons likely to endanger it. See S.Rep. No. 225, 98th Cong., 2d Sess. 8 (1984); S.Rep. No. 147, 98th Cong., 1st Sess. 34–35 (1983); S.Rep. No. 317, 97th Cong., 2d Sess. 21 (1982).

■ The nonpunitive purpose stated by Congress can be rationally connected to pretrial detention. Pretrial detention does not punish past conduct but rather protects the community from reasonably predictable future conduct. *See Edwards v. United States,* 430 A.2d 1321, 1332 (D.C.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). As in *Schall* there is no justification for the conclusion that the statute is a punitive rather than a regulatory measure.[5]

Hazzard also disputes the Congressional finding that future criminal conduct can be reasonably predicted by the courts. The response to this argument is that the Supreme Court has repeatedly held that courts are able to predict dangerousness

---

5. Hazzard seems to argue that pretrial detention must be punishment because *all* detention is punishment, at least where it is grounded on a prediction that a defendant represents a danger to the community. This contention cannot survive *Schall v. Martin,* —— U.S. ——, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). Hazzard attempts to distinguish *Schall* and *Edwards* on the ground that the statutes in those cases contained a maximum time period for pretrial detention. However, contrary to Hazzard's contention, pretrial detention under the Act does have a time limit. The Speedy Trial Act, 18 U.S.C. § 3161, *et seq.,* requires that the trial of a detained person "shall be accorded priority" (§ 3164(a)) and that

a trial commence 70 days after the indictment, after which time the indictment must be dismissed (§ 3161(c)(1) and § 3161(d)(2). Once an indictment is dismissed, the pretrial detainee, like the defendant detained for failure to post bond, would have to be released. Though perhaps redundant, it is also significant that § 3164 of the Speedy Trial Act limits pretrial detention to 90 days. Of course, excludable time may result in a detention beyond 70 (or 90) days and in those circumstances a pretrial detainee may have valid statutory and constitutional arguments favoring his release on bail or from detention. However, that case is not before this Court.

with a constitutionally acceptable risk of error. In *Schall* the Supreme Court stated:

> Our cases indicate, however, that from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct. Such a judgment forms an important element in many decisions,[30] and we have specifically rejected the contention, based on the same sort of sociological data relied upon by appellees and the district court, "that it is impossible to predict future behavior and that the question is so vague as to be meaningless." *Jurek v. Texas,* 428 U.S. 262, 274 [96 S.Ct. 2950, 2957, 49 L.Ed.2d 929] (1976) (opinion of Stewart, Powell and Stevens, J.J.); *id.* at 279 [96 S.Ct. at 2959] (White, J., concurring).
>
> We have also recognized that a prediction of future criminal conduct is "an experienced prediction based on a host of variables" which cannot be readily codified.

[30] See *Jurek v. Texas,* 428 U.S. 262, 274–275, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (death sentence imposed by jury); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 9–10, 99 S.Ct. 2100, 2104–05, 60 L.Ed.2d 668 (1979) (grant of parole); *Morrisey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972) (parole revocation).

A prediction of future criminal conduct may also form the basis for an increased sentence under the "dangerous special offender" statute, 18 U.S.C. § 3575 (1976 & Supp. V 1981). Under § 3575(f), a "dangerous" offender is defined as an individual for whom "a period of confinement longer than that provided for such [underlying] felony is required for the protection of the public from further criminal conduct by the defendant." The statute has been challenged numerous times on the grounds that the standing is unconstitutionally vague. Every Court of Appeals considering the question has rejected that claim. *United States v. Davis,* 710 F.2d 104, 108–109 (CA3), *cert. denied,* — U.S. —, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983); *United States v. Schell,* 692 F.2d 672, 675–676 (CA10 1982); *United States v. Williamson,* 567 F.2d 610, 613 (CA4 1977); *United States v. Bowdach,* 561 F.2d 1160, 1175 (CA5 1977); *United States*

*v. Neary,* 552 F.2d 1184, 1194 (CA7), *cert. denied,* 434 U.S. 864 [98 S.Ct. 197, 54 L.Ed.2d 139] (1977); *United States v. Stewart,* 531 F.2d 326, 336–337 (CA6), *cert. denied,* 426 U.S. 922 [96 S.Ct. 2629, 49 L.Ed.2d 376] (1976).

104 S.Ct. at 2417–18. Accordingly, the Act is not vulnerable to the charge that its objectives are unattainable.

■ Turning next to the procedures employed under the Act, they too are sufficient to meet the test stated in *Schall.* Hazzard was able to challenge the government's showing at the detention hearing. The statute provides for representation by counsel, the right to testify, to cross-examine, to present and subpoena witnesses and to offer information by proffer (18 U.S.C. § 3142(f)(2)(B)). If detention is ordered there must be written findings of fact and a statement of reasons for the order (§ 3142(i)(1)). Prior to the hearing a defendant is apprised of the charges against him. This was followed, in this case, by a prompt hearing. These procedures were found to be adequate in *Schall* and were adequate in this case.[6]

## 2. Equal Protection

■ Hazzard also challenges the Act under the equal protection component of the Fifth Amendment's due process clause. He argues that within the class of persons who represent a danger to the community, no rational distinction can be made between those who have been charged with a crime and those who have not. However, "the Equal Protection Clause does not require that [Congress] must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that [Congress's] action be rationally based and free from invidious discrimination." *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). The Act here challenged satisfies that standard. Congress could reasonably think those charged with a crime are more likely a threat to the community than those

**6.** Unlike the statute involved in *Schall,* the Act here in question also requires that the facts supporting the magistrate's finding that the defendant must be detained as a threat to the community be supported by clear and convinc-

ing evidence (§ 3142(f)). Also, the Act itself specifies the factors to be considered. Compare 18 U.S.C. § 3142(g) with *Schall,* 104 S.Ct. at 2416–17.

not so charged, because probable cause exists to believe that a criminal defendant has in fact recently committed a crime. Also, Congress could reasonably restrict its efforts to increase community safety to the class of criminal defendants on the ground that a broader effort would be very intrusive, inefficient, and expensive.

■ Hazzard's equal protection challenge also rests on a claimed denial of an equal opportunity to adequately prepare a defense—what Hazzard refers to as an "equal litigational opportunity." However, the Act specifically provides, as did Magistrate Sussman's order, that a detained defendant be afforded reasonable opportunity, including temporary release if necessary, for private consultation with counsel. 18 U.S.C. § 3142(i). Therefore, no fundamental right is being denied[7] and the proper standard is whether a rational reason exists for the distinction. Obviously, such a reason exists: Hazzard represents a danger to the community and non-detained defendants do not.

## C. Hazzard was not Improperly Denied Discovery or Confrontation Rights

Hazzard argues that two additional procedural safeguards should have been provided in order to protect his rights and reduce the risk of error—prehearing discovery and limitation on the use of hearsay in the government's case.

Hazzard sought discovery of all evidence concerning lineups, photographic identifications, the statements of all witnesses, fingerprints and documents, as well as the identity of confidential informants.

■ Discovery in criminal cases is controlled by statute and by the Federal Rules of Criminal Procedure. Hazzard does not argue that the discovery sought was appropriate under the Jencks Act, 18 U.S.C. § 3500, or Fed.R.Crim.P. 16. The Act does not create any discovery rights. This was not an oversight. The District of Columbia preventive detention statute, on which the Act was modeled, does not provide for discovery. See S.Rep. No. 225, 98th Cong., 2d Sess. 12 (1984); *United States v. Edwards,* 430 A.2d 1321, 1334 (citing H.R.Rep. 907, 91st Cong., 2d Sess. 182, 184 (1970) (D.C. 1981). Moreover, there is no precedent for discovery prior to bail hearings. *United States v. Lewis,* 266 F.Supp. 897 (S.D.N.Y. 1967).

■ The only exculpatory evidence identified by Hazzard is the fact that some of the persons who viewed the line-up did not identify him. However, this fact was not concealed since counsel was present at the line-up. Defendants were able to discuss this matter at the hearing although they were not provided with further details of the line-up. In any event, other evidence was sufficient to sustain the Magistrate's findings.

■ Hazzard claims that the detention hearing was a sham because much of the government's case consisted of hearsay. Hazzard does not contend that the use of hearsay violated the Act. The Act provides that the "rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information of the [detention] hearing." The statute also provides that the accused may present evidence of a detention hearing "by proffer or otherwise." § 3142(f).

The use of hearsay is not so fundamentally unfair as to rise to the magnitude of a constitutional violation. Defendants were permitted to question the government's witnesses and free to argue that the government's case was not "clear and convincing." It may well be that hearsay alone will rarely, if ever, satisfy the clear and convincing standard. However, the evidence here rested for the most part on

---

**7.** Hazzard does argue detention violates his Sixth Amendment right to effective assistance of counsel. However, no showing is made that the consultation with counsel provided for by the Act is in fact insufficient. Moreover, Hazzard's argument goes too far since it would require invalidating even the traditional forms of detention, such as those who pose an unacceptable flight risk. Such is not the law. *See Pinson v. Williams,* 410 F.Supp. 1387 (S.D.Ohio 1975).

Hazzard's own statement, and it is not contended that the statement was inadmissible for failure to give constitutional warnings or because of any preliminary invalidity.

The use of informal procedures in probable cause hearings was approved by the Supreme Court in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The Court stated:

> That standard—probable cause to believe the suspect has committed a crime—traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony and the court has approved these informal modes of proof.

*Id.* at 120, 95 S.Ct. at 866. *See also Kent v. United States,* 383 U.S. 541, 557, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84 (1966). Moreover, *Schall,* 104 S.Ct. at 2417, approved informal procedures in the pretrial detention context. As the Court there stated, Hazzard has "failed to note any additional procedures that would significantly improve the accuracy of the determination without unduly impinging on the achievement of legitimate state purposes." *Id.*

Notwithstanding the use of some hearsay evidence, the evidence at the hearing was clear and convincing and the hearing was not a sham.

**D. The Application of the Act to Offense Charged to Have Occurred Prior to October 12, 1984 Does Not Violate the Ex Post Facto Clause of the Constitution**

Because the crime with which he is charged was allegedly committed on October 6, and the Act was not effective until October 12,[8] Hazzard argues that to apply the Bail Reform Act would violate the *Ex Post Facto* clause of the Constitution, Art. I, § 9, cl. 3. The Supreme Court has indicated what must be shown to establish a violation of the *Ex Post Facto* clause. In *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) the Court said "our decisions prescribe that two critical elements must be present for a criminal or penal law to be *Ex Post Facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."

As already discussed, pretrial detention is not punishment for the crime charged. Therefore, it cannot be said to *"apply* to events occurring before its enactment" in the traditional *ex post facto* sense of punishing acts which, when committed, were legal. Of course, the detention here imposed was *based,* in part, on the fact that probable cause existed to believe Hazzard had committed a crime that occurred before the Act's effective date. And certainly detention does "disadvantage the offender affected by it." However, in a variety of circumstances it has been held that the government may rely on offenses which occurred prior to the passage of a relevant act to establish the status of an accused, *see, e.g., United States v. Ricketson,* 498 F.2d 367, 374 (7th Cir.), *cert. denied,* 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974) (involvement in organized crime). It has been held that felonies which occurred prior to passage of gun control legislation may nevertheless be used as the basis for prohibiting felons from receiving firearms subsequent to the passage of that legislation, *United States v. Sutton,* 521 F.2d 1385, 1390–91 (7th Cir.1975). As the Seventh Circuit explained in *Sutton*

> It is well established "that where Congress has rationally concluded that persons who have demonstrated a tendency in the past to engage in conduct that Congress has the power to proscribe, Congress may restrict such future activi-

---

**8.** On October 12, 1984 the Comprehensive Crime Act of 1984, of which the Bail Reform Act is a part, was approved by the President and became law. The Act contains no provisions regarding its effective date. As a result, it became fully effective on October 12, 1984. *DeLima v. Bid-*

*well,* 182 U.S. 1, 197, 21 S.Ct. 743, 753, 45 L.Ed. 1041 (1901); *United States v. Gavrilovic,* 551 F.2d 1099, 1103 (8th Cir.1977); *United States v. Clizer,* 464 F.2d 121, 123 n. 2 (9th Cir.1972), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 697, 34 L.Ed.2d 673.

ties without violating the *Ex Post Facto* prohibition."

521 F.2d at 1390–91 (quoting *United States v. Karnes*, 437 F.2d at 289–900). *See United States v. Nasser*, 476 F.2d 1111, 1117 (7th Cir.1973) ("where there is a sufficiently rational relationship between the past activity and the public interest in excluding unworthy people, the disqualification is not a punishment.")

Habitual offenders statutes which create new or aggravated crimes for subsequent offenses based on prior predicate offenses have been upheld when applied to defendants whose offenses predate the statute, *McDonald v. Massachusetts*, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901), as was a law disqualifying ex felons from labor unions, *DeVeau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 1154, 4 L.Ed.2d 1109 (1960). The theory of these cases is similar to the application of the Act here.

 The Act does not disadvantage the defendant in any way prohibited by the *Ex Post Facto* Clause. It does not criminalize conduct that was innocent when done. It does not make more burdensome the punishment for any charged offense, nor does it deprive defendant of any defense. Application of the Act is not counter to the principle "that persons have a right to fair warning of that conduct which will give rise to criminal penalties," *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977).

## IV. Conclusion

Clear and convincing evidence indicates that Hazzard and his companions were involved in a spree of random crime and violence. Their original objective was armed robbery of some person or persons in the vicinity of the areas where they encountered the victims' van. They appear to have been diverted to abduction, sexual assault and theft of a van by fortuitous circumstances. The conduct of Hazzard and his companions shows characteristics of impulsive, random violence. This is not a crime arising out of special or unusual circumstances—such as a crime of passion against a spouse, burning one's own home to collect the insurance proceeds, or committing robbery for the sole purpose of supporting an addiction to a controlled substance—where the imposition of carefully drawn conditions of bail or other measures can assure the safety of individual persons or the community by preventing such circumstances from arising while the defendant is out on bail. See 18 U.S.C. § 3142(c)(2), enumerating various possible conditions. Hazzard and his companions have shown disregard for numerous laws and a propensity to commit whatever violent crime circumstances allow. Persons who manifest such characteristics and act on them present a predictable danger to the safety of the community which no set of conditions on release can reasonably prevent.

Heretofore, the interest of community safety has not been addressed in federal bail proceedings unless it was indirectly (and perhaps improperly) considered in fixing the amount of bail required to secure the appearance of a person charged. Now, in those presumably few cases in which grounds exist for a detention order, the safety of an individual or the community will be directly and openly considered and detention on that basis will be subject to review. In all other cases, as the statute mandates, bail will be fixed only high enough to secure the appearance of the person charged. 18 U.S.C. § 3142(c). This is a forthright manner in which to set bail that is fair to an accused person as well as the community.

Having considered the proceedings before the Magistrate, the Magistrate's order and the arguments submitted in support of the motion to revoke or amend, it is concluded that the motion should be and hereby is denied.