**UNITED STATES of America, Plaintiff,**

v.

**Peter ARVANITIS, Robert Richards, also known as "Joseph Moretti," "Robert Moreno," "Ray Milano" and "Bob Ricardi," Peter Leventopoulos, also known as "Muscles," Perikles Panagiotaros, also known as "Perry Panagiotaros," John Yannakis, Anastasios Paschalis, Peter Gaitanis, Stellos Panagiotaros, also known as "Stanley Peters," Nick Chris George, Bill Chris George, Peter George Chekalas, Defendants.**

**No. 87 CR 515.**

United States District Court, N.D. Illinois, E.D.

Aug. 17, 1987.

Ted Helwig, Steven Miller, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Thomas A. Durkin, Chicago, Ill., for Arvanitis.

Richard Pezzopane, Oak Lawn, Ill., for Leventopolous.

Thomas J. Royce, Chicago, Ill., for Richards.

Ronald D. Menaker, Chicago, Ill., for Panagiotaros.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This matter comes before this Court on the motions of defendants Peter Arvanitis, Robert Richards, Peter Leventopoulos and Perikles Panagiotaros to revoke the pretrial detention order entered on July 22, 1987, by United States Magistrate W. Thomas Rosemond, Jr. After a two-day hearing, the Magistrate found that the government had proven by clear and convincing evidence that no condition of release specified under 18 U.S.C. § 3142 (West Supp.1987) will reasonably assure the safety of the community, and by a preponderance of the evidence, that no condition short of detention will reasonably assure the attendance of the defendants at trial. For the reasons stated below, after de novo [1] review of the Magistrate's decision and the facts contained on the record of the proceedings before the Magistrate which are incorporated herein, this Court finds by clear and convincing evidence that no condition of release specified under 18 U.S.C. § 3142 will reasonably assure the safety of the community, and by a preponderance of the evidence, that no condition short of detention will reasonably assure the attendance of these defendants as required.

### Pretrial Detention

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156 (West Supp.1987), a

---

1. The parties have not addressed the issue of what is the appropriate standard of review this Court should give the Magistrate's detention order. The Seventh Circuit has not indicated what the proper standard of review we are to undertake in reviewing the Magistrate's order, but other circuits have considered this and have concluded that the district court should review the Magistrate's decision de novo and make its own conclusions. *See United States v. Hurtado*, 779 F.2d 1467, 1480 (11th Cir.1985) (citing *United States v. Maull*, 773 F.2d 1479, 1481–85 (8th Cir.1985) (en banc); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985); *United States v. Delk-er*, 757 F.2d 1390, 1394–95 (3d Cir.1985); *United States v. Williams*, 753 F.2d 329, 333 (4th Cir. 1985)). Because we do not have the benefit of the parties' arguments as to the proper standard of review, we have gone ahead and given the Magistrate's decision plenary review and have arrived at our own conclusions of facts. We express no opinion, however, on the legal issue of the proper standard of review. We base our factual conclusion upon the basis of the parties' in-court arguments before us, a review of the 446–page transcript of the proceedings before the Magistrate, briefs of the parties and the Magistrate's decision.

defendant may be detained in custody pending trial "[i]f, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial." 18 U.S.C. § 3142(e). The judicial officer's conclusion that no conditions of release can reasonably assure the safety of other persons and the community must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). The judicial officer's conclusion that no condition short of detention will reasonably assure the attendance of the defendants at trial must be supported by a preponderance of the evidence. *United States v. Portes,* 786 F.2d 758 (7th Cir. 1985).

In determining whether there are conditions of release which will reasonably assure the appearance of the defendants and the safety of any other person and the community, we are to take into consideration the factors set forth in § 3142(g).[2] In general, these factors include (1) the nature and seriousness of the charges; (2) the substantiality of the government's evidence against the arrestee; (3) the arrestee's background and characteristics, and (4) the nature and seriousness of the danger posed by the suspect's release. *United States v. Salerno,* —— U.S. ——, ——, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

The defendants have raised a number of issues with respect to the detention order that we must address before we reach the underlying factual issues. Because of extensive discovery and motion procedures required by defendants to prepare, trial has been set to commence on January 18, 1988. This is a firm date. Defendant Leventopoulos argues that the delay before the completion of the trial in this matter is a violation of his right to due process under the Fifth Amendment. We agree that "at some point, the length of delay may raise due process objections ... [h]owever ... at this stage of the proceedings, a determination that the length of detention is impermissible 'both as a statutory and constitutional matter is premature.'" *United States v. Portes,* 786 F.2d 758, 768 (7th Cir.1985). However, because of the complexity of this multicontinental trial, 11 defendants and 28 counts, the delay herein is not constitutionally improper.

Finally, defendant Arvanitis argues that the government could not meet the clear and convincing burden as to dangerousness because its evidence was principally hearsay. We disagree. First, Arvanitis concedes that hearsay is permissible in the detention hearing because the statute itself provides that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142. As Judge Hart noted in *United States v. Hazzard,* 598 F.Supp. 1442, 1454 (N.D.Ill.1984), "[i]t may well be that hearsay alone will rarely, if ever, satisfy the clear and convincing standard," how-

---

**2.** Section 3142(g) sets forth the following factors:

(g) FACTORS TO BE CONSIDERED.—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

\* \* \* \* \* \*

18 U.S.C. § 3142(g) (West Supp.1987).

ever, that is not the case in this situation. First, in addition to the admittedly hearsay summary of the government's evidence presented by the the Alcohol, Tobacco and Firearms ("ATF") Agent Biliks, the government also presented physical evidence:

(1) transcripts of recorded conversations by Arvanitis and Leventopoulos;

(2) numerous physical exhibits such as toll records and pen register results;

(3) a group exhibit constituting a bomb kit found in Richard's vehicle in September 1984;

(4) remnants of a pipe bomb recovered from the Bloomingshire Restaurant;

(5) shotguns recovered from defendant Leventopoulos at the time of his arrest;

(6) handwritten notes of defendant Richards detailing the design and construction of explosive devices;

(7) a book entitled *The Poor Man's James Bond,* recovered from defendant Richards;

(8) a telephone and address diary recovered from the defendant Richards;

(9) a copy of a receipt for rocket casings and cardboard tubes found in defendant Richard's trash;

(10) a gasoline credit card slip showing that defendant Richards purchased gasoline in Canada; and

(11) a transcript of a meeting between the defendant Leventopoulos and an ATF undercover agent.

Defendant Arvanitis contends because the majority of the physical evidence does not pertain to him, that as to him, the government cannot have met its clear and convincing burden because the evidence was substantially hearsay. We disagree.

It is true that some of the evidence is of a hearsay nature, for example, Agent Bilik recounted the conversation defendant Arvanitis had with John Katsamangas where Arvanitis told Katsamangas and Chris Ralides that their business would be blown up if they did not pay Arvanitis money they owed to him. However, the government also introduced evidence relating directly to Arvanitis and evidence connecting Arvanitis to the other defendants in this case. We need not decide whether or not pure hearsay testimony alone could meet the clear and convincing standard because we have more than hearsay evidence alone in this case implicating defendant Arvanitis.[3]

*Findings of Fact as to Risk of Flight*

■ We first observe that, contrary to the government's respresentation which was no doubt made in good faith, there appears to be a valid extradition treaty between the United States and Greece. Treaty of Extradition and Exchange of Notes, May 6, 1931, entered into force November 1, 1932; United States-Greece, 47 Stat. 2185, TS. 855; 8 Bevans 353; 138 L.N.T.S. 2933 ("Extradition Treaty"). This treaty is still valid today. *Treaties in Force:* A list of Treaties and other International Agreements of the United States on January 1, 1986, p. 70.[4] The treaty, however, does provide that persons can only be delivered up for the commission of a limited number of crimes, and once delivered up, they may only be tried on those crimes. Extradition Treaty, Art. II, IV, 47 Stat. 2186–2190. Because the list of crimes in the treaty does not include all of the crimes charged in the indictment, for example, the RICO counts, the treaty is still relevant to the issue of flight, albeit less relevant than if there had not been a treaty.[5] Neverthe-

---

**3.** Arvanitis raises one other issue as to the validity of the Magistrate's decision. Arvanitis alleges that the Magistrate "impermissibly affixed evidentiary value to the indictment." We disagree. There is nothing in the Magistrate's order which would indicate he treated the indictment improperly. Under § 3142(g), the indictment may be considered as one factor in determining whether the defendant should be detained. The Magistrate's opinion indicates that he did just that. (*See* ¶ 23.)

**4.** Pursuant to instructions in *Treaties in Force,* this Court confirmed the fact that this treaty is still in effect as of August 5, 1987, through the United States Department of State Office, Office of Treaty Affairs.

**5.** The Extradition Treaty also provides that neither party shall be obligated to deliver up its own citizens. *See* Art. VIII. To the extent that some of these defendants were born in Greece, although now naturalized citizens of the United States, the party delivering up the person deter-

less, we still conclude that the government has shown by a preponderance of the evidence as to defendants Arvanitis, Richards, Leventopoulos and Panagiotaros that there is no condition or combination of conditions which will reasonably assure their appearance as required.

As to defendant Arvanitis, the evidence showed that he was born in Greece but is now a naturalized American citizen. The evidence also showed that he and co-defendant Panagiotaros have recently traveled to Greece and have contacts there. The government demonstrated that it is relatively easy for a Greek-American citizen to secure a Greek passport and on relatively short notice. Finally, Arvanitis faces a possible sentence of 110 years if convicted on all counts. This along with the factors noted above increases the risk of flight. Arvanitis argued because he was aware that he was being investigated by the U.S. Attorney back in July of 1986 and he did not flee then, that he will not flee now. However, the notice to which Arvanitis refers, Defendant's Exhibit 2–A, a notice from the credit card company that it had to turn records over to the government, does not indicate the charges or seriousness of the investigation. Thus, we too reject that argument and find by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant Arvanitis as required.

As to defendant Leventopoulos, the evidence showed that he too is a Greek-American who could easily obtain a Greek passport on relatively short notice. The government also presented evidence that Leventopoulos, along with the other detained defendants, is a member of this arson "gang" which has contacts in California and Greece. Although there was no direct evidence that Leventopoulos had any contacts in these areas, we find the gang's connections are probative of Leventopoulos' tendency not to appear. Finally, Leventopoulos faces a potential sentence of 110 years if convicted on all counts. This, along with the factors noted above, increases the risk of flight. Accordingly, we find by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of defendant Leventopoulos as required.

The facts underlying the risk of flight as to defendant Panagiotaros are similarly persuasive. The evidence showed that Panagiotaros is a Greek-American citizen who has recently traveled to Greece with defendant Arvanitis and, like the other Greek-American defendants, has relatively easy access to a Greek passport. Finally, Panagiotaros also faces a very significant sentence of 155 years if convicted on all counts. Accordingly, we find by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of defendant Panagiotaros as required.

Finally, we find by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably assure the appearance of defendant Richards as required. The evidence showed that Richards has traveled to Canada using an alias and has used multiple aliases in the commission of these crimes he is charged with. This plus the extremely high sentence of 165 years that Richards faces if convicted of all counts increases the risk of flight.

### Dangerousness [6]

We find by clear and convincing evidence that each of these four defendants, Arvani-

---

mines the citizenship issue, and Greece may well decide anyone born in Greece is a Greek citizen regardless of other citizenships. *See* R. Steel, *Steel on Immigration* § 15:7 (1985) (despite requirement that naturalized citizens must renounce all other citizenships, persons from some countries continue to be nationals of those countries, and thus would continue to have dual nationality).

**6.** Under 18 U.S.C. § 1342(e), a rebuttable presumption can arise in certain circumstances that no condition or combination of conditions will reasonably assure the safety of any other person and the community. In the case of defendants Richards, Panagiotaros and Leventopoulos, the firearm violations they are charged with triggers this statutory presumption. We find, however, as did the Magistrate, that in the case of Richards, the evidence of his good pro-

tis, Leventopoulos, Panagiotaros and Richards, must also be detained pending trial because there is no condition or combination of conditions which will reasonably assure the safety of any other person or the community. Defendants Arvanitis, Leventopoulos, Panagiotaros and Richards are severally and together charged by a 28–count indictment with, *inter alia*, attempt to commit extortion; conspiracy to commit extortion; engaging in and using threats of violence and actual violence for the purpose of extorting money and property from persons in Chicago, Illinois, Long Beach, California, and Piraeus, Greece; racketeering; engaging in the business of performing contract bombings and arsons on behalf of individuals who operated businesses and who desired to defraud their insurance carriers by procuring the destruction of their businesses and filing fraudulent claims for insurance; multiple acts of arson in violation of the laws of the States of Illinois and Oregon; an unlawful use of firearms. The conspiracies, racketeering activities and other crimes charged were alleged to have been committed during the time period 1981 to the return of the indictment, around May 1987.

Based on the evidence submitted, we make the following findings.[7]

### The Conspiracy

As to the criminal conspiracy in general, defendants Arvanitis, Leventopoulos, Panagiotaros and Richards constitute the core of an alleged criminal conspiracy which engages in life-threatening acts of violence on a national and international scale of which the primary activities of the conspiracy are arsons, in which explosives and bombs are frequently used, and extortion, in which violence and acts of violence are used as tools of the conspiracy.

The evidence demonstrated that between 1981 and May 1987, bombings and arsons were carried out by the defendants at the Arrowhead Restaurant in Chicago's downtown loop section (July 29, 1981); Bloomingshire Restaurant, Chicago, Illinois (May 9, 1983); George's Fruitmarket, Chicago, Illinois (September 5, 1983); Stanley's Fruitmarket, Chicago, Illinois (June 28, 1984); Bonfire Restaurant in downtown Portland, Oregon (August 1984) and Maxwell Plums, Elk Grove Village, Illinois (May 18, 1987). Additionally, in conjunction with the extortion activities of the group, a bombing was performed in Piraeus, Greece, on April 5, 1986; the business of an extortion victim in Chicago was bombed; two vehicles belonging to another extortion victim was firebombed; the victim and his friend were threatened with death and another individual beaten. In addition to these acts, the government presented a transcript in which one of the members of the conspiracy boasted that he and the guys had done this sort of thing "[a] hundred times." (Government's Exhibit 13).

### Arvanitis

Before we can consider evidence of dangerousness as to defendant Arvanitis, we must address his argument that the government has failed to show by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the government presented no evidence that related to Arvanitis' dangerousness other than evidence which related to the crimes alleged in the indictment. Essentially, Arvanitis seems to argue that because the government's only evidence of dangerousness related to acts Arvanitis is charged with in the indict-

bation reporting and in the case of all three, the evidence of the community ties, length of residence was sufficient to rebut the statutory presumption. *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir.1986). The presumption then remains, however, "as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.*

7. These findings, of course, are not conclusive in any sense. The defendants are presumed innocent. The government's burden of proof will be different at trial than it is for these motions. At trial, when both sides have the opportunity to fully present the relevant evidence, the trier of fact, in separately considering each count in the indictment, could find that proof beyond a reasonable doubt is lacking in regard to one or all defendants.

ment, any finding of dangerousness would violate Arvanitis' right to due process. (Arvanitis' Reply at 6). Apparently Arvanitis believes that a finding of dangerousness can only be made if, for example, the government presented evidence that Arvanitis committed some violent crime not charged in this indictment. We disagree. Under 18 U.S.C. § 3142(g)(3)(A), evidence of a person's past criminal history are but one of many aspects of an individual's history and characteristics that comprises but one of the factors to be considered in determining the dangerousness issue. The evidence the government presented in this case addressed all four factors, (1) the nature and circumstances of the offense; (2) the weight of the evidence against Arvanitis; (3) the history and characteristics of Arvanitis, specifically that Arvanitis' activities in this case continued despite his knowledge since 1986, that he was under investigation by the United States Attorney; and (4) the nature and seriousness of the danger to any person or the community posed by Arvanitis' release. We find that the evidence presented by the government is probative as to all these factors. Accordingly, we reject Arvanitis' challenge to the finding of dangerousness in this case as a violation of his due process right.

The government presented the following evidence as to the factors in § 3142(g) with respect to defendant Arvanitis. First and foremost, the government showed that Arvanitis was "the guy," the individual in charge of this conspiracy. The government showed that there must be one person who makes the decisions and approves the arsons because defendant Leventopoulos on tape said to a government agent that he had to get approval for an arson job from someone:

> Government Agent: Yeah, we know where to say away from but the thing is the things you can do keeps shrinking that's why. Its hard to make a business grow when you're kinda put into a spot like that you know.
> Leventopoulos: Yeah.
> Government Agent: So how ...

Leventopoulos: We can begin with you know immediately but I'm telling ya ...
Government Agent: But I talk only to you or ...
Leventopoulos: You talk only to me. Now once I take the job there's no further contact with me. Unless its an absolutely imperative if you're gonna call me you call me from outside we meet and talk you do not talk on the damn phone. Okay?
Government Agent: Mmm Mmm No No
Leventopoulos: Now I'm gonna be honest with you. Every[t]ime we talk everytime we talk I'm gonna pat you down. I don't care you know I'm gonna pat you down. Not that I don't trust you, I like to take precautions as much as possible. You mind that?
Government Agent: No.
Leventopoulos: Do you mind that?
Government Agent: No. That's what you wanna do.
Leventopoulos: That is its gotta be done. Its gotta be done. I gotta protect myself theres so much shit going on I gotta protect myself. I gotta protect myself. Now you still wanna go?
Government Agent: Yeah.
Leventopoulos: Huh?
Government Agent: Can you get ahold of him?
Leventopoulos: Okay now here's what. I'm gonna get ahold of the guy. I'm gonna go talk to him today or tomorrow sometime cause I know time is, time is tight for you. Now *I'm gonna ask him and see what he says, and see's what he says.*[8]

Then with respect to the Arrowhead, Bonfire and Maxwell Plum arson/bombings, the government demonstrated that while those fires were set either by Panagiotaros and Richards, before each bombing, close in time to the actual bombing, telephone calls were made between Arvanitis' phone and the owner's telephone.

The government showed additional evidence that Arvanitis was the leader of this arson/bombing conspiracy. Defendant

8. Government Exhibit 13 at 9 (emphasis added).

Panagiotaros made an arrangement with the owners of a lounge to provide an entertainer from Greece in return for twenty percent of the lounge's income during the period the entertainer worked. After the Greek nightclub singer finished his run at the lounge, the owners were visited by Panagiotaros who said he would be back with his partner Peter Arvanitis to collect their share. Later, after Arvanitis and Panagiotaros examined the lounge's books, they claimed to be owed $2,000. The owners disagreed because that figure did not include any business expenses. Shortly after this, Arvanitis and Panagiotaros came back to the nightclub, this time with defendants Richards and Leventopoulos. At that time, Arvanitis grabbed one of the nightclub owners stating, "You better pay my money or else the business is going to be blown up." (Tr. 135.)

In addition to this evidence, the government demonstrated that Arvanitis was directly responsible for multiple acts of extortion. In 1986, Arvanitis demanded the payment of an apparently legitimate $40,-000 note from a Californian, Franteskos Sdralis. Following Sdralis' refusal to pay the money, Arvanitis made a number of telephone threats which were tape recorded. Essentially, Arvanitis told Sdralis that if he did not pay the $40,000 by a certain day that what happened to the Jews by Hitler would be nothing by comparison to what would happen to Sdralis. Shortly after these threats, Sdralis' nephew in Greece was approached by three men. The nephew was told that "Pete" from Chicago had sent them to collect to $40,000, and that if the money was not paid, bad things would happen in Greece and Los Angeles. Just after that, the nephew spoke with Arvanitis. Arvanitis told him that if the money was not paid, he would find a bullet in his head. On April 5, 1986, Sdralis' brother, the father of the nephew, found a bomb at his door, which he fortunately threw across the street before it blew up.

In summary, we find by clear and convincing evidence submitted by the government that there is no condition or a combination of conditions which can reasonably assure the safety of a person or the community and, accordingly, deny Arvanitis' motion to revocation of the Magistrate's detention order.

### Leventopoulos

We find by clear and convincing evidence as to defendant Leventopoulos that no condition or combination of conditions will reasonably assure the safety of a person or the community. As alluded to above, the government's evidence showed Leventopoulos to be a key member of this conspiracy. On March 19, 1986, Leventopoulos met with a government agent posing as a businessman with too many debts who wanted his business destroyed. During an extensive conversation, Leventopoulos said that he had experts working with him who had done these arson/bombings "a hundred times."

Among the bombings that Leventopolous was responsible for is the bombing of Stanley's Fruitmarket in which three firemen were injured. On June 16, 1984, Louis Kyriazopolous came to work at Stanley's Fruitmarket, which he had leased from defendant Stelios Panagiotaros.[9] Kyriazopolous was forcibly thrown out of the business by Leventopolous and Perikles and Stelios Panagiotaros. Leventopolous installed himself as the new lessee of the business and procured insurance. Twelve days after Kyriazopolous was thrown out under a threat of violence, the building was blown up through multiple bombs shown to be made by defendant Richards. During the tape recorded conversation with the government agent, Leventopoulos boasted of his expertise. "Did you see my place … it was a fruitmarket … The building, it had nothing flamable in it and it was a total loss." Following his forcible eviction, Kryiazopolous opened a new business. Within months after the takeover, on two occasions vehicles were driven through the plate glass windows of his new establish-

---

**9.** This is not the same Panagiotaros defendant whose detention order we are currently reviewing.

ment and an explosive device was detonated on its roof.

Leventopolous, along with Richards, also violently took over Brompton Body Shop, 3532 North Halsted Street, Chicago, Illinois, from the co-owner John Koruelis. The evidence established that Leventopolous arranged for Kourelis to be arrested and removed from the Body Shop by filing a false police report. When Kourelis returned to his business, he was met by Leventopolous, who pointed a gun at him and threatened to kill Kourelis and his family if he ever returned to the business. Thereafter, subsequent to Kourelis having lost his business, his vehicle was deliberately burned through arson. Additionally, the government demonstrated that at the time of his arrest on July 13, 1987, Leventopolous was in possession of two shotguns and a large caliber handgun.

In summary, we find based on clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of a person or the community if defendant Leventopolous is released. His actions demonstrate a complete disregard for the potential danger caused by his activities or concern for those injured by his actions. Three firemen were injured in the bombing of Stanley's Fruitmarket, but all Leventopolous cared about was whether or not the fruitmarket was totally destroyed.

### Panagiotaros

We find as to defendant Panagiotaros by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of a person or the community if he is released. The government presented evidence demonstrating Panagiotaros' intimate involvement in this arson conspiracy. He participated in the violent eviction of Louis Kyriazopolous from Stanley's Fruitmarket, thereby setting the scene for the bombing of that place twelve days later in which three firemen were injured. Additionally, Panagiotaros was an active participant in the extortion incident with the owners of Scorpio's Lounge. When the owners did

not pay the contested $2,000 to Arvanitis and Leventopolous, Panagiotaros came to visit the owners and threatened them with injury if they did not pay the money. Then he was also there when the defendants all came back to threaten to blow up the business if they did not pay.

Finally, the most egregious example of Panagiotaros' dangerousness is his total lack of concern for the ramifications of his arson activities. The evidence demonstrated that he was responsible for a major fire in a high-rise archtectural landmark building in downtown Chicago. That fire could easily have spread to engulf the entire high-rise building. Luckily, however, the fire was spotted immediately when it started.

In summary, we find that the government met its burden to show by clear and convincing evidence that Panagiotaros must be detained.

### Richards

Finally, with respect to defendant Richards, we find by clear and convincing evidence that there is no condition or combination of conditions which will reasonably assure the safety of a person or the community if Richards is released on bond. Probably the strongest evidence of Richards' dangerousness is the evidence which shows that he was responsible for the bombing of the Maxwell's Plum restaurant in May 1987, while Richards was on probation for another crime. The government also presented evidence that Richards is a serial bomber and extortionist who took his orders from Arvanitis. The evidence demonstrated that significant bomb remnants survived the Bloomingshire, George's, Stanley's, Bonfire and Maxwell Plum's arson/bombing. These remains were analyzed by experts at the National laboratory of the Bureau of Alcohol, Tobacco and Firearms. The ATF National Laboratory concluded that based on an overall design similarity among the components, as well as common use of highly unusual components, a single individual manufactured the destructive devices used to destroy each of the above-named establishments.

On September 28, 1984, Richards was arrested by the Chicago Police Department while driving his vehicle. During an inventory search of the vehicle, a portable bomb factory was found inside the trunk of the vehicle. The ATF lab determined that the destructive devices used to destroy the businesses mentioned above were built from items in the bomb kit seized from Richards. The analysis was made, in part, by tool mark analysis, which indicated the pliers in the bomb kit was used to crimp a plastic electrical butt connector found at the Bloomingshire bombing scene, and the similarity of components in the bomb kit with those used to build bombs found at other locations. Richards' fingerprint was matched to a latent print on an item in the bomb kit, and Richards ordered the chemicals found in the bomb kit.

Other evidence introduced against Richards established that he is a professional bomber. The Bonfire Restaurant, Portland, Oregon, was bombed August 19, 1984. The evidence showed that on the morning of August 19, 1984, Richards flew to Portland under the alias Joseph Moretti, stayed overnight and returned to Chicago the next morning.

In May of 1986, detectives with the Chicago Police Department, Bomb and Arson Unit, began to recover and examine trash discarded by Richards. Detectives recovered numerous highway road flares from which the highly combustible ignition caps had been removed. Also, a document was recovered showing that Richards had just received a mail order shipment of several dozen cardboard "rocket cases." Recovered from the scene of the bombing were identical cardboard tubes, which are used to construct the explosive ignitor section of a pipe bomb.

On May 15, 1986, federal agents executed a search warrant of Richards' residence. Agents found six pages of handwritten notes detailing the design, construction and detonation of incendiary devices and bombs. Handwriting analysis confirmed Richards to be the author. Also recovered was a book called *The Poor Man's James Bond*, which is an underground guide to bomb construction. A diary was also found which contained coded telephone numbers belonging to Peter Arvanitis, Perikles Panagiotaros, Peter Leventopolous, Franteskos Sdralis (the Long Beach, California, extortion victim) and the Brompton Body Shop (belonging to extortion victim John Kourelis).

The government also established that Richards told the wife of the Long Beach, California, extortion victim, Franteskos Sdralis, that he was going to blow up her house, and that he conveyed verbal death threats to Peter Markos, a friend of extortion victim John Kourelis, who tried to help Kourelis recover his business after it was forcibly taken over by Leventopolous and Richards.

Thus, we find that the government adequately met its burden to show by clear and convincing evidence as to Richards that no condition or combination of conditions will reasonably assure the safety of a person or the community if Richards is released. These extreme acts of violence that he has committed over and over, even while on probation, attest to his dangerousness and to our conclusion that bail must be denied.

In conclusion, we deny defendants Peter Arvanitis, Robert Richards, Peter Leventopoulos and Perikles Panatiotaros' motion for revocation of the detention order. We find that the government has demonstrated by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of these defendants as required, and by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of a person or the community if these defendants are released on bond. It is so ordered.